UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

SOFIA SAENZ,                                      **07 CIV 10534 (WCC)**

                              Plaintiff(s),

            -against-                             **NOTICE OF MOTION**

EDWARD LUCAS, individually, VINCENT
MUSSOLINO, individually, RICHARD
LIGHT, individually, MARK DiGIACOMO,
individually, POLICE OFFICER JANE DOE,
individually, and the TOWN/VILLAGE OF
HARRISON, New York,

                              Defendants.
--------------------------------------------------------X

    ***PLEASE TAKE NOTICE*** that upon the accompanying Memorandum of Law

dated the 23rd day of July, 2008, the Declaration of Neil Torczyner dated the 23rd of

July 2008, and all the papers and pleadings heretofore had herein, Defendants,

EDWARD LUCAS and MARK DiGIACOMO shall move this Court before the Hon.

William Conner, at the United States District Court, Southern District of New York,

located at 300 Quarropas Street, White Plains, New York, pursuant to Local Rule 6.3,

for reconsideration of the Court's Order of July 9, 2008 and upon the grant of

reconsideration, for an order dismissing the plaintiff's complaint against Defendants

EDWARD LUCAS and MARK DiGIACOMO and for such other and further relief as

may be just, proper and equitable under the circumstances existing herein.

Dated: Purchase, New York
      July 23, 2008

Yours etc.,
FRIEDMAN, HARFENIST, KRAUT & PERLSTEIN
Attorneys for Defendant
TOWN/VILLAGE OF HARRISON, New York
2975 Westchester Avenue, Ste. 417
Purchase, New York   10577
(914) 701-0800

By:_____S_____
        Neil Torczyner

TO: Lovett & Gould, LLP
Attorneys for Plaintiffs
222 Bloomingdale Road
White Plains, NY 10605
(914) 428-8401

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

SOFIA SAENZ,                                                    **07 CIV 10534 (WCC)**

                                        Plaintiffs,

        -against-

EDWARD LUCAS, individually, VINCENT              **DECLARATION OF**
MUSSOLINO, individually, RICHARD                 **NEIL TORCZYNER**
LIGHT, individually, MARK DiGIACOMO,
individually, POLICE OFFICER JANE DOE,
individually, and the TOWN/VILLAGE OF
HARRISON, New York,

                                        Defendants.
-------------------------------------------------------X

        Neil Torczyner, an attorney admitted to practice in the courts of the United

States District Court for the Southern District of New York, declares the following,

under the penalties of perjury

        1.      I am an associate with the firm of Friedman, Harfenist, Kraut & Perlstein,

attorneys for the Defendants in the above captioned matter. I submit this Declaration

in support of Defendants Edward Lucas and Mark DiGiacomo's motion for

reconsideration of the Court's July 9, 2008 Order.

        2.      A copy of the Court's July 9, 2008 Order is appended hereto as Exhibit

"A".

        3.      A copy of the First Amended Complaint filed by the Plaintiff and served

on the Defendants on February 20, 2008 is appended hereto as Exhibit "B".

        4.      A copy of Defendants' Memorandum of Law in Support of the Motion to

Dismiss is appended hereto as Exhibit "C".

      5.      A copy of Plaintiff's Memorandum of Law in Opposition to the Motion

to Dismiss is appended hereto as Exhibit "D".

Dated: Lake Success, New York
      July 23, 2008

          _____S_____
          Neil Torczyner

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - X

SOFIA SAENZ,

                      Plaintiff,

     - against -

EDWARD LUCAS, individually, VINCENT
MUSSOLINO, individually, RICHARD LIGHT,
individually, MARK DiGIACOMO,
individually, POLICE OFFICER JANE DOE,
individually, and the TOWN/VILLAGE OF
HARRISON, New York,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - X

07 Civ. 10534 (WCC)

**ECF CASE**

**OPINION
AND ORDER**

**A P P E A R A N C E S :**

                      LOVETT & GOULD, LLP
                      **Attorneys for Plaintiffs**
                      222 Bloomingdale Road
                      White Plains, New York 10605

JONATHAN LOVETT, ESQ.

     Of Counsel

                      FRIEDMAN, HARFENIST, LANGER
                        & KRAUT, LLP
                      **Attorneys for Defendants**
                      2975 Westchester Avenue, Suite 415
                      Purchase, New York 10577

NEIL TORCZYNER, ESQ.

     Of Counsel

**Copies E-Mailed to Counsel of Record**

**Conner, Sr. D.J.:**

Plaintiff, Sofia Saenz, brings this action under 42 U.S.C. § 1983 against defendants Edward Lucas ("Lucas"), Vincent Mussolino ("Mussolino"), Richard Light ("Light"), Mark DiGiacomo ("DiGiacomo"), Police Officer Jane Doe ("Doe") and the Town/Village of Harrison, New York (the "Town"), alleging that defendants violated her rights under the Fourth Amendment of the United States Constitution. Defendants Lucas, DiGiacomo and the Town moved to dismiss the claim against them pursuant to FED. R. CIV. P. 12(b)(6). For the following reasons, defendants' motion is denied.

## BACKGROUND

Plaintiff alleges the following in her Amended Complaint.

On August 20, 2007 plaintiff witnessed an incident between her then boyfriend, Joshua D. Clark ("Clark"), and her former boyfriend, Ralph Tancredi ("Tancredi"), during which Clark threatened to strike Tancredi with a baseball bat. (Am. Complt. ¶ 8.) Two responding police officers observed Clark with the bat and by radio informed Police Captain Anthony Marraccini ("Marraccini") that Clark was threatening Tancredi. (*Id.* ¶ 9.) Marraccini made it clear that he intended to charge Tancredi and not Clark. (*Id.*) Plaintiff alleges that Marraccini has a personal animus toward Tancredi because Tancredi filed federal civil rights actions against him and the Town Police Department, Tancredi expressed concern that he and the Chief of Police engaged in felonies with respect to members of the Department and Tancredi expressed concern that he forged a check intended for the Police Benevolent Association (the "PBA"). (*Id.*)

Plaintiff was transported to Police Headquarters from the scene and officers Mussolino and

1

Doe detained her in a room for approximately three hours in an attempt to coerce her to bear witness against Tancredi. (*Id*. ¶ 10.) Plaintiff alleges defendants did this to retaliate against Tancredi for having filed the civil rights actions and that the retaliatory conduct was known to and condoned by members of the Town Board of Police Commissioners (the "Town Board"). (*Id*.) Plaintiff did not consent to this detention and made it clear to the officers that she had no interest in assisting in the retaliatory plan. (*Id*. ¶ 11.)

Several days later Mussolino came to plaintiff's residence and attempted to coerce her to sign paperwork for issuance of a temporary order of protection in her favor against Tancredi. (*Id*. ¶ 12.) Plaintiff refused and Mussolino directed her to call Assistant District Attorney Barbara Eggenhauser ("Eggenhauser"). (*Id*.) Eggenhauser directed plaintiff to report to the District Attorney's Office where Eggenhauser advised her that, if she did not agree to an order of protection, Clark would "get in trouble." (*Id*. ¶¶ 13-14.) Plaintiff continued to refuse to agree to the order of protection. (*Id*. ¶ 15.)

Eggenhauser summoned plaintiff to her office again and, acting in concert with Officer Lucas and Detective Light, instructed plaintiff that she had been "abused" by Tancredi and questioned her about alleged cocaine use by Tancredi. (*Id*. ¶ 16.) Light falsely advised plaintiff that Tancredi referred to her as a "coke whore," and Lucas advised her that Tancredi had stolen money from the PBA. (*Id*. ¶¶ 17-18.) Eggenhauser, Light and Lucas then threatened to seek to have plaintiff deported if she did not cooperate with them against Tancredi (plaintiff is of Peruvian national origin.) (*Id*. ¶¶ 3, 19.)

Plaintiff was brought to Tancredi's court appearance and subsequently Light, on the pretext that he would driver her to her residence, drove her to Police Headquarters and placed her in a room

and interrogated her about Tancredi. (*Id.* ¶ 20.) Plaintiff protested her confinement, stating that she

wanted to leave and did not "want to be part of this." (*Id.*) Officers Lucas and DiGiacomo joined

Light in the room with plaintiff and further interrogated her, suggesting that Tancredi was involved

in illegal gambling operations. (*Id.* ¶ 21.) Plaintiff again protested that she wanted to go home, and

in response Lucas told her "go with the order of protection – you're in with us." (*Id.*)

Plaintiff filed this action on February 12, 2008 claiming defendants violated her rights under

the Fourth Amendment because she did not consent to her confinements at Police Headquarters and

in Eggenhauser's office, she was aware of the confinements, there was no probable cause or arguable

probable cause to detain her and the detentions were not otherwise privileged or authorized.

Defendants Lucas and DiGiacomo move to dismiss the claim against them because there is no

indication in the Complaint that they arrested or confined plaintiff. The Town moved to dismiss on

the ground that plaintiff failed to allege a municipal policy, practice or procedure that gave rise to

a constitutional violation.

## DISCUSSION

### I.   Legal Standard

A motion brought under FED. R. CIV. P. 12(b)(6) posits that the plaintiff has failed "to state

a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). On a motion to dismiss pursuant

to Rule 12(b)(6), a court must accept as true all of the well-pleaded facts and consider those facts in

the light most favorable to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled*

*on other grounds*, *Davis v. Scherer*, 468 U.S. 183 (1984); *Nechis v. Oxford Health Plans, Inc.*, 421

F.3d 96, 100 (2d Cir. 2005); *In re AES Corp. Sec. Litig.*, 825 F. Supp. 578, 583 (S.D.N.Y. 1993)

(Conner, J.).   In assessing the legal sufficiency of a claim, the court may consider only the facts alleged in the complaint, and any document attached as an exhibit to the complaint or incorporated in it by reference. *See* FED. R. CIV. P. 10(c); *Dangler v. N.Y. City Off Track Betting Corp.*, 193 F.3d 130, 138 (2d Cir. 1999); *De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 69 (2d Cir. 1996).

On a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), the issue is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (internal quotation marks and citation omitted).   The fact pleading standard is "a flexible 'plausibility standard' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d. Cir. 2007) (emphasis in original); *see Ello v. Singh*, 531 F. Supp. 2d 552, 562 (S.D.N.Y. 2007).   Allegations that are so conclusory that they fail to give notice of the basic events and circumstances of which plaintiff complains are insufficient as a matter of law.  *See Martin v. N.Y. State Dep't of Mental Hygiene*, 588 F.2d 371, 372 (2d Cir. 1978).

## II.    Fourth Amendment Claim

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV; *see also Arizona v. Evans*, 514 U.S. 1, 10 (1995).   The Fourth Amendment prohibits "police seizures of persons for custodial interrogation—even brief detentions falling short of arrest—without probable cause." *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001).   To determine whether an encounter constitutes a seizure, "a court must consider the totality of the circumstances and ascertain whether

the police conduct would have communicated to a reasonable person that he was free to terminate the

encounter." *See United States v. Miller*, 382 F. Supp. 2d 350, 366 (N.D.N.Y. 2005) (citing *Florida*

*v. Bostick*, 501 U.S. 429, 439 (1991)); *Bennett v. Town of Riverhead*, 940 F. Supp. 481, 488

(E.D.N.Y. 1996) (threat by officer to arrest parent if parent did not turn child over to officer could

constitute "seizure" for purposes of Fourth Amendment because "[plaintiff's] only options were to

hand over her child or to be arrested"); *see also I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984); *Svitlik*

*v. O'Leary*, 419 F. Supp. 2d 189, 191 (D. Conn. 2006) (question of fact as to whether seizure occurred

where "detectives forced [plaintiff] to go to the police department by expressly threatening to arrest

him and tow his car if he refused").

The courts have set forth a non-exclusive list of factors suggesting that a seizure has occurred,

including: "the threatening presence of police officers; the display of a weapon; physical contact by

the officer; language indicating that compliance with the officer is compulsory; prolonged retention

of a person's belongings; and a request by an officer to accompany him or her to the police station

or a police room." *United States v. Rogers*, 2000 WL 101235, at *10 (S.D.N.Y. Jan. 27, 2000) (citing

*Gardiner v. Incorporated Vill. of Endicott*, 50 F.3d 151, 155 (2d Cir. 1995)); *see Harris v. Wydra*,

531 F. Supp. 2d 233, 242 (D.Conn. 2007) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554

(1980)). The court must base its conclusion on the totality of the circumstances surrounding the

encounter. *Rogers*, 2000 WL 101235, at *10 (citing *United States v. Glover*, 957 F.2d 1004, 1008

(2d Cir.1992)); *see United States v. Torres*, 949 F.2d 606, 609 (2d Cir. 1991).

In *Rogers*, the court determined that, without more, the detectives' request that the plaintiff

accompany them back to the station house, the setting of the police station and the interrogation room

were not so coercive as to preclude a reasonable person from feeling free to leave. 2000 WL 101235,

at *10-11. The plaintiff argued that a reasonable person would not have felt free to leave in the middle of an interrogation that lasted for over two hours, during which the detectives repeatedly told him that they believed he was a participant in a homicide. *Id.* at *14. The court stated that: "It has long been the rule, in this circuit and elsewhere, that questioning of a suspect that is prolonged and accusatory in nature suggests the occurrence of a seizure." *Id.* (citing *inter alia United States v. Mire*, 51 F.3d 349, 353 (2d Cir. 1995)). The court determined that the repeated, accusatory statements from two interrogating officers over the course of more than two hours, when viewed in light of all the circumstances, would lead a reasonable person to believe that he would not be permitted to leave the police station. *Id.*

An unreasonable seizure determination is based on the circumstances, and detention in a police station interrogation room may not necessarily lead a reasonable person to believe that he or she was not free to leave. But if the person is detained for a length of time, interrogated in a threatening way or otherwise subjected to circumstances in which a reasonable person would feel that he or she was no longer free to leave, the detention could become an unreasonable seizure. *See Delgado*, 466 U.S. at 216. At what point that happens, or what events would give rise to that claim, is based on an assessment of the particular circumstances. *See Gilles v. Repicky*, 511 F.3d 239 (2d Cir. 2007). We do not decide on this motion if plaintiff was subjected to an unreasonable seizure; we merely decide whether plaintiff has sufficiently alleged that, defendants participated in events that in the circumstances constituted an unreasonable seizure.

Defendants argue that there is no indication in the Amended Complaint that DiGiacomo and Lucas arrested or confined plaintiff; they argue that the Amended Complaint states that they entered the room after any alleged arrest occurred. (Defs. Mem. Supp. Mot. Dismiss at 8.) Defendants cite

6

case law to support this argument. (*Id.* at 8-9 (citing *Merritt v. City of New York*, 2001 WL 1097866, at *2 (S.D.N.Y. Sept. 19, 2001) ("Officer Bradbury did not arrive until well after the initial arrest had taken place . . . . Because Officer Bradbury was not involved in plaintiff's arrest (under plaintiff's scenario), plaintiff may not assert a false arrest claim against Officer Bradbury."); *Dallas v. Goldberg*, 2000 WL 1092986, at *6-7 (S.D.N.Y. Aug. 4, 2000) (dismissing false arrest claim against defendant officer who arrived on the scene after plaintiff was on the ground in handcuffs and whose sole responsibilities were securing evidence and searching a female arrestee for weapons)).) However, these cases determined whether the named defendants were personally involved in the plaintiff's arrest in order to determine whether they would be liable for a false arrest claim.

Defendants' argument is too narrow. Defendants focus on a specific type of Fourth Amendment unreasonable seizure claim, that of false arrest. The cases defendants cite are inapplicable because plaintiff does not allege a false arrest claim. The Amended Complaint alleges a violation of plaintiff's rights as guaranteed by the Fourth Amendment; this includes unreasonable seizures that do not amount to an arrest. *See Delgado*, 466 U.S. at 215 ("the protection against unreasonable seizures also extends to seizures that involve only a brief detention short of traditional arrest") (internal quotation marks and citation omitted). Defendants have not cited, nor are we aware of, any case law that would support the argument that if defendants did not put plaintiff in the room to detain her but rather participated in interrogating her after she was already detained in that room, they are not liable for an unreasonable seizure claim. Even considering the cases defendants cite, our determination would be the same because we conclude that plaintiff has sufficiently alleged defendants personal involvement in her seizure. Plaintiff has sufficiently alleged a plausible claim that her detention and interrogation at the police station with DiGiacomo and Lucas and her detention

and interrogation with Lucas at Eggenhauser's office were without probable cause and under circumstances in which the officers' conduct would have communicated to a reasonable person that she was not free to terminate the encounter. Plaintiff alleges that she was detained and interrogated without probable cause after she protested that she wanted to leave and did not want to be involved, and that the officers interrogated and threatened her and made false statements to coerce her to retaliate against Tancredi. Therefore plaintiff's claims against DiGiacomo and Lucas survive this motion to dismiss.

## III.    <u>Monell Claim</u>

Section 1983 imposes liability on a government that, under color of some official policy, "causes" an employee to violate a person's constitutional rights. *Monell v. Dep't of Soc. Serv. of City of N.Y.*, 436 U.S. 658, 692 (1978). A municipality may be liable for a constitutional violation inflicted by its employees or agents when the injury is a result of the execution of a municipal policy or custom. *Id.* at 694. To establish the existence of a municipal policy or custom, the plaintiff must allege: (1) the existence of a formal policy officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to "deliberate indifference" to the rights of those who come in contact with the municipal employees. *See Prowisor v. Bon-Ton, Inc.*, 426 F. Supp. 2d 165, 174 (S.D.N.Y. 2006) (Conner, J.). Plaintiff attempts to establish municipal policy by alleging that defendants Lucas and DiGiacomo were acting

8

at the direction of Marraccini, who, she alleges, had policymaking authority. (Am. Complt. ¶¶ 4, 9.)
She also attempts to establish municipal policy by alleging that the Town Board, which has
policymaking authority, had knowledge of and condoned defendants' retaliatory conduct. (*Id.* ¶ 10.)

In *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163,
168 (1993), the Supreme Court held that a federal court may not apply a "heightened pleading
standard" in civil rights cases alleging municipal liability under section 1983. Courts in this district
have analyzed *Monell* claims using the standard set forth in *Leatherman*. *See Javid v. Scott*, 913 F.
Supp. 223, 230-31 (S.D.N.Y. 1996) (Conner, J.); *see also Cooper v. Metro. Transp. Auth.*, 2006 WL
1975936, at *3 (S.D.N.Y. July 14, 2006). Therefore, the pleading standard applicable in a motion to
dismiss, outlined above, is the appropriate standard in analyzing plaintiff's claim against the Town.
Applying *Leatherman*, we determine that plaintiff has given defendants fair notice of a custom or
policy that would establish municipal liability under section 1983. *See Cortlandt v. Westchester
County*, 2007 WL 3238674, at *9 (S.D.N.Y. Oct. 31, 2007) (the plaintiff's allegation that the County
had or passively approved a policy permitting improper and grossly negligent use of mental hygiene
laws to institutionalize elderly citizens coupled with the plaintiff's seizure and commission to the
hospital gave fair notice of plaintiff's municipal policy claim).

For a municipality to be liable for its employee's constitutional violation, the challenged
action must have been undertaken by an authorized "final policymaker." *See City of St. Louis v.
Praprotnik*, 485 U.S. 112, 123 (1988) ("only those municipal officials who have 'final policymaking
authority' may by their actions subject the government to § 1983 liability") (internal citation omitted).
"[W]hether an official had final policymaking authority is a question of state law." *Pembaur v. City
of Cincinnati*, 475 U.S. 469, 483 (1986); *see Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 109 (2d

Cir. 2006). The policymaking authority may be "granted directly by a legislative enactment or may be delegated by an official who possesses such authority." *Pembaur*, 475 U.S. at 483.

According to statute, the Town Board has authority to " make, adopt and enforce rules, orders and regulations for the government, discipline, administration and disposition of the police department and of the members thereof." N.Y. Town Law § 154. Plaintiff alleges that Marraccini, who is the Police Captain, had final decision making authority with respect to the conduct of investigations "by reason of the Chief of Police's abdication of responsibilities." (Am. Complt. ¶ 4.) By alleging that the Chief of Police has final decision making authority with respect to investigations, plaintiff has carried her burden on this motion.

Defendants argue that lower level police supervisors, like Marraccini, are not policymakers, and the Amended Complaint does not contain any facts that could plausibly be construed to indicate that Marraccini was a policymaker. (Defs. Mem. Supp. Mot. Dismiss at 15-16.) But, if Marraccini is the "acting" Chief of Police, as plaintiff alleges, then it is plausible that he has final decision making authority with respect to the conduct of investigations, as plaintiff also alleges. Defendants cite case law determining that lower level police supervisors do not have final decision making authority. *See Allan v. City of New York*, 386 F. Supp. 2d 542, 546 (S.D.N.Y. 2005) (granting summary judgment to defendants as to municipal liability because plaintiff failed to establish that orders given by the Captain constituted City policy because the Captain was not a "policymaker" for purposes of municipal liability); *Raphael v. County of Nassau*, 387 F. Supp. 2d 127, 132 (E.D.N.Y. 2005) (dismissing municipal claim on summary judgment because the Sergeant may have been the ranking officer on the scene but his orders on the scene did not constitute official municipal policy because he was not a policymaker). *But see Jeffes v. Barnes*, 208 F.3d 49, 57-61 (2d Cir. 2000)

10

(considering facts on motion for summary judgment, determined that Sheriff was, as a matter of law, the County's final policymaking official with respect to the conduct of his staff members toward fellow officers who exercise their First Amendment rights). However, these cases were decided after consideration of the facts on summary judgment.

It is plausible that the Harrison Police Captain might have final decision making authority with respect to officer conduct during investigations. *See Johns v. Town of E. Hampton*, 942 F. Supp. 99, 106 (E.D.N.Y. 1996) (determining that the Complaint succeeded in stating a claim under 42 U.S.C. § 1983 against the Town on the basis of custom and policy as a result of alleged final decisions made by the Police Commissioner and the Police Chief). Defendants have not called to our attention any legal authority that would foreclose the possibility. Although it is ultimately plaintiff's burden to establish that Marraccini was the Police Captain in Harrison and, as a matter of law, had final decision making authority with respect to officer conduct during investigations and interrogations, plaintiff has alleged enough to survive this motion to dismiss. *See Kempkes v. Downey*, 2008 WL 852765, at * 8-9 (S.D.N.Y. Mar. 31, 2008) (denying motion to dismiss on municipal liability because the court could not conclude that the Bronxville Chief of Police was not a final policy maker).

Defendants also argue that plaintiff has not plead any facts that could plausibly indicate that the Town Board was aware of a retaliation policy and ignored it. (Defs. Mem. Supp. Mot. Dismiss at 18-19.) Defendants argue that, even if the Amended Complaint could be construed as pleading a theory that the Town Board had a *de facto* policy of retaliating against parties for filing lawsuits against the Town, plaintiff's injuries did not result from such a policy because she does not allege that the actions at issue were taken against her because of any lawsuit she filed. (*Id.* at 19.) As plaintiff has not alleged that the Town Board knew of or condoned a policy regarding officer conduct during

11

investigations and interrogations, she has not sufficiently alleged a plausible ground for holding the Town liable based on any Town Board policy. However, because we find that plaintiff has sufficiently alleged a plausible ground for holding the Town liable based on Marraccini's conduct, we can not dismiss plaintiff's claim against the Town.

## CONCLUSION

For all of the foregoing reasons, the defendants' motion to dismiss is denied.

SO ORDERED.

Dated: White Plains, New York
June 9, 2008

Sr. United States District Judge

12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



*Parties Added
Amended Summons Issued*

**ORIGINAL**

------------------------------------------------------X

SOFIA SAENZ,

                        Plaintiff,

           -against-

EDWARD LUCAS, individually, VINCENT
MUSSOLINO, individually, RICHARD
LIGHT, individually, MARK DiGIACOMO,
individually, POLICE OFFICER JANE DOE,
individually, and the TOWN/VILLAGE OF
HARRISON, New York,

                        Defendants.

------------------------------------------------------X

07 Civ. 10534 (WCC)

**FIRST AMENDED
COMPLAINT**

U.S. DISTRICT COURT
FILED
FEB 13 2008
W.P.
S.D. OF N.Y.

**Jury Trial Demanded**

      Plaintiff SOFIA SAENZ, by her attorneys Lovett & Gould, LLP, for her first

amended complaint respectfully states:

## NATURE OF THE ACTION

      1. This is an action for compensatory damages and punitive, proximately resulting

from Defendants' conduct as engaged in under color of the laws of the State of New

York, for violations of Plaintiff's rights as guaranteed by the Fourth Amendment to the

United States Constitution, 42 U.S.C. §1983.

## JURISDICTION

      2. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§1331, 1343.

USDC SDNY
DOCUMENT
ELECTRONICALLY  FILED
DOC #: _____
DATE FILED: _____

1

## THE PARTIES

3. Plaintiff SOFIA SAENZ is a female of Peruvian national origin, a domiciliary of the State of New York, and a resident of the Northern Counties.

4. Defendants EDWARD LUCAS (hereinafter "Lucas") and MARK DiGIACOMO (hereinafter "DiGiacomo") who are sued in their individual and personal capacities only, at all times relevant to this complaint were employed as Police Officers by the Defendant municipality (hereinafter alternatively the "Town"). Lucas and DiGiacomo - - as were their individually named co-defendants were directed to engage in the conduct set forth *infra* by Anthony Marraccini (hereinafter "Marraccini"), a Town Police Captain who, by reason of the Chief of Police's abdication of responsibilities regarding the Police Department, *de facto* enjoys plenary, final decision making authority with respect to the conduct of "investigations" such as the one referenced *infra*.

5. Defendant VINCENT MUSSOLINO (hereinafter "Mussolino"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was employed as a Police Officer by the Town.

6. Defendant RICHARD LIGHT (hereinafter "Light"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was employed as a Detective by the Town.

7. Defendant TOWN/VILLAGE OF HARRISON, New York, is a municipal corporate subdivision of the State of New York duly existing by reason of and pursuant to the laws of said State. Defendant JANE DOE (hereinafter "Doe"), who is sued in her

2

individual and personal capacities only, is a member of the Town's Police Department. Her true identity is not presently known to Plaintiff.

## THE FACTS

8. At 9:15 p.m. on August 20, 2007, at 235 Harrison Avenue in the Town, Plaintiff witnessed an incident involving Joshua D. Clark (Plaintiff's then boyfriend) and Ralph Tancredi (Plaintiff's former boyfriend, a police officer employed by the Town, the President of the Town's PBA, and a Plaintiff against the Chief of Police, the Town's Police Captain and others in a number of pending federal civil rights actions) during which *inter alia* Clark threatened to strike Tancredi in the head with a baseball bat.

9. Town police responding to the scene observed Clark in possession of the bat and by radio informed Marraccini that Clark was threatening Tancredi with the bat. In response Marraccini made it clear that he had no intention of charging Clark, but rather intended to develop a case against Tancredi with respect to whom Marraccini harbors personal animus because of: i) the above-referenced civil rights actions; ii) Tancredi's expression of concern regarding Marraccini and the Chief of Police (David Hall's) having engaged in felonies with respect to members of the Department (including illegal eavesdropping and video taping officers in the police locker room in states of undress); and iii) Tancredi's expression of concern that Hall had forged a check intended for the PBA and diverted it to a different police association with regard to which he was a member and officer.

10. Under the circumstances the bat was seized by the police who transported Plaintiff to the Town's Police Headquarters where Defendants Mussolino and Doe

detained her in a room for approximately three hours with a view towards coercing her, over her repeated objection, to bear witness against Tancredi - - not because of any wrongdoing by Tancredi, but to retaliate against Tancredi for *inter alia* his having previously filed the referenced civil rights actions. *See e.g.* DeVittorio v. Hall, 07 Civ. 0812 (WCC); Duffelmeyer v. Marshall, 07 Civ. 2807 (WCC). That retaliatory conduct is known to, and has been expressly condoned by, a majority of the members of the Town's Board of Police Commissioners which *de jure* has final discretionary policy making authority over the Police Department and its administration.

11. At the time of Plaintiff's detention in Headquarters she did not consent and made it clear to her captors that she had no interest in assisting in their retaliatory plan. In that connection there was neither probable cause nor arguable probable cause to believe she had engaged in any wrongdoing, she was conscious of her confinement, and that confinement was not otherwise authorized and/or privileged.

12. Several days thereafter Mussolino presented himself at Plaintiff's residence and attempted to coerce Plaintiff to sign paperwork as a predicate for issuance against Tancredi and in favor of Plaintiff of a temporary order of protection. Plaintiff refused and as a result Mussolino directed her to call Assistant District Attorney Barbara Eggenhauser.

13. In turn Eggenhauser directed Plaintiff to report to the Office of the District Attorney where, again, Plaintiff repeatedly advised that she did not want anything to do with either an order of protection involving Tancredi or assisting in the [First Amendment] retaliation directed against Tancredi by reason of his federal lawsuits.

4

14. Despite Plaintiff's repeated protestations to Eggenhauser, Eggenhauser advised Plaintiff that if she did not agree to an order of protection Clark would "get in trouble" - - a threat that she had earlier conveyed to Clark who she told would be arrested on Tancredi's complaint if he (Clark) did not first accuse Tancredi of criminal wrong doing.

15. At the time of Plaintiff's in-office meeting with Eggenhauser and following Plaintiff's repeated refusals to agree to an order of protection, Plaintiff's confinement in Eggenhauser's office was non-consensual, Plaintiff was aware of her confinement, there was no probable cause and/or arguable probable cause to detain her, and that detention was not otherwise privileged or authorized. Eggenhauser's conduct with respect to Plaintiff was in accordance with long-established policy of the District Attorneys (past and current) who have knowingly condoned Eggenhauser's commission of crimes including subornation of perjury by a civilian complainant and a County Police Officer before a Westchester County Grand Jury [Corona v. Lunn, 00 Civ. 7330 (BDP)]. As to the incumbent District Attorney's condonation of criminal wrong-doing by high ranking members of the Harrison Police Department and members of the New York State Police, see Tornello v. County of Westchester, 07 Civ. 6697 (CLB).

16. One day prior to Tancredi's appearance in Town Justice Court on a violation (Harrassment in the Second Degree in violation of New York Penal Law Section 240.26) relating to Clark and the August 20, 2007, interaction, Eggenhauser again summoned Plaintiff to her office at which time Eggenhauser (acting in concert with Lucas and Light) repeatedly instructed Plaintiff (over Plaintiff's objections) that she had been "abused" by Tancredi and questioned her about supposed cocaine abuse by Tancredi.

5

17. Light then falsely advised Plaintiff that Tancredi had referred to Plaintiff as a "coke whore".

18. Lucas in turn advised Plaintiff that Tancredi was a thief and had stolen money from the PBA.

19. Eggenhauser, Light and Lucas all then made not so subtle threats that if Plaintiff did not cooperate with them against Tancredi in connection with the retaliatory plan with respect to which Plaintiff did not want to participate they would seek to have her deported.

20. Subsequent to Tancredi's Town Court appearance, to which Plaintiff had been brought by Town police, Light (on the pretext that he was going to drive Plaintiff to her residence), drove her instead to Police Headquarters where he placed her in a room and interrogated her about Tancredi. In response Plaintiff repeatedly protested her confinement, advising that she was "hungry and wanted to leave - - I don't want to be part of this". Light would not permit Plaintiff to depart.

21. Lucas and DiGiacomo then joined Light in the room with Plaintiff and further interrogated her, this time suggesting that Tancredi was involved in illegal gambling operations. Again Plaintiff protested that she did not want "any part of this" and that she "want[ed] to go home". In response Lucas cautioned her to "go with the order of protection - - you're in with us". Ultimately, Light drove Plaintiff to her residence.

22. Plaintiff's repeated confinements at Headquarters and her confinement in Eggenhauser's office by Light, Lucas, Mussolino, and DiGiacomo were not consented to by her, she was aware of her confinements, there was no probable cause or arguable

probable cause for her detentions, and those confinements were not otherwise privileged or authorized.

23. As a proximate result of Defendants' conduct Plaintiff has been forced to endure: repeated unlawful imprisonments; repeated victimization as a result of incidents of Official Misconduct, Coercion and Attempted Coercion by the Defendants; repeated threats against her and Clark; emotional upset; anxiety; public embarrassment; public humiliation; shame and she has otherwise been rendered sick and sore.

## AS AND FOR A CLAIM

24. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "23", inclusive.

25. Under the premises Defendants violated Plaintiff's rights as guaranteed by the Fourth Amendment to the United States Constitution, 42 U.S.C. §1983.

WHEREFORE judgment is respectfully demanded:

    a. Awarding against the individually named defendants such punitive damages as the jury may impose,

    b. Awarding against the Town such compensatory damages as the jury may determine,

    c. Awarding reasonable costs and attorney's fees, and,

d.   Granting such other and further relief as to the Court seems just and

proper.

Dated: White Plains, N.Y.
        February 12, 2008

LOVETT & GOULD, LLP
By:
Jonathan Lovett (4854)
Attorneys for Plaintiff
222 Bloomingdale Road
White Plains, N.Y. 10605
914-428-8401

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
SOFIA SAENZ,                                        **07 CIV 10534 (WCC)**

                                    Plaintiffs,

        -against-

EDWARD LUCAS, individually, VINCENT
MUSSOLINO, individually, RICHARD
LIGHT, individually, MARK DiGIACOMO,
individually, POLICE OFFICER JANE DOE,
individually, and the TOWN/VILLAGE OF
HARRISON, New York,

                                    Defendants.
------------------------------------------------------X

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS EDWARD LUCAS, MARK DIGIACOMO AND THE TOWN/VILLAGE OF HARRISON, NEW YORK'S MOTION TO DISMISS

**FRIEDMAN, HARFENIST, LANGER & KRAUT**
**Attorneys for Defendants**
**Town/Village of Harrison, New York**
**2975 Westchester Avenue, Suite 415**
**Purchase, New York  10577**
**(914) 701-0800**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ i

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF FACTS ......................................................................................... 2

POINT I

    THE LEGAL STANDARD FOR A MOTION TO DISMISS ................................... 5

POINT II

    THE PLAINTIFF HAS FAILED TO STATE A CAUSE OF ACTION AGAINST
    LUCAS AND DIGIACOMO ................................................................................... 6

POINT III

    THE PLAINTIFF HAS FAILED TO IDENTIFY AN OFFICIAL POLICY,
    PRACTICE OR PROCEDURE THAT ALLEGEDLY GAVE RISE TO THE
    CONSTITUTIONAL VIOLATION ......................................................................... 9

        A.  The Elements of a Cause of Action for Monell Violations............................. 10

        B.  Saenz Has Not Properly Pleaded a Municipal Policy ...................................... 12

        C.  Captain Marracini Is Not A Policymaker ........................................................ 13

        D.  The Complaint Does Not Allege a Widespread Practice That Could
            Constitute Municipal Custom .......................................................................... 16

CONCLUSION ......................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Allan v. City of New York*, 386 F.Supp.2d 542 (S.D.N.Y. 2005)................................................ 16
*Allen v. City of New York*, 2007 WL 24796 (S.D.N.Y. Jan. 3, 2007).......................................... 15
*Anthony v. City of New York*, 339 F.3d 129 (2d Cir. 2003)........................................................ 15
*Baron v. Complete Management, Inc.*, __ F.3d __, 2008 WL 205327 (2d Cir. 2008) .................. 5
*Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S.Ct. 1955,1966, 167 L.Ed.2d 929
  (2007),.......................................................................................................................................... 5
*Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).......................... 9
*Carbajal v. County of Nassau*, 271 F.Supp.2d 415, 422 (E.D.N.Y. 2003)................................... 18
*Dallas v. Goldberg*, 2000 WL 1092986 (S.D.N.Y. Aug. 4, 2000) ................................................ 8
*Decker v. Campus*, 981 F.Supp. 851, 857 (S.D.N.Y. 1997) ......................................................... 7
*Diodatti v. City of Little Falls*, 2007 WL 189130 (N.D.N.Y. Jan. 22, 2007) ............................. 16
*Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993)............................................................. 17
*Esgro v. Serkiz*, 2007 WL 203957 (N.D.N.Y. Jan. 24, 2007)....................................................... 16
*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 177
  (2d Cir.2004)................................................................................................................................ 5
*Goldfine v. Kelly*, 80 F.Supp.2d 153, 162, (S.D.N.Y. 2000) ........................................................ 9
*Hodge v. Ruperto,* 739 F.Supp. 873, 877, (S.D.N.Y. 1990) ........................................................ 11
*Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007)................................................................................ 18
*Martino v. Westchester County Dept. of Corrections*, 2008 WL 144827 at *3
  (S.D.N.Y. Jan. 15, 2008)............................................................................................................. 12
*McCray v. City of New York*, 2007 WL 4352748 (S.D.N.Y. Dec. 11, 2007) .............................. 18
*Merritt v. City of New York*, 2001 WL 1097866 (S.D.N.Y. Sept. 19, 2001)................................ 8
*Miotto v. Yonkers Public Schools,* 2008 WL 199472 at * 2, (S.D.N.Y. Jan. 22, 2008) ................ 6
*Monell v. City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ............. passim
*Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct, 1292, 89 L.Ed.2d 452 (1986)....... 13
*Prowisor v. Bon-Ton, Inc.,* 426 F.Supp.2d 165 (S.D.N.Y. 2006),................................................ 11
*Qader v. New York*, 396 F.Supp.2d 466, 469 (S.D.N.Y. 2005)..................................................... 11
*Raphael v. County of Nassau*, 387 F.Supp.2d 127,132 (E.D.N.Y. 2005).................................... 16
*Shain v. Ellison*, 273 F.3d 56, 67 (2d Cir. 2001) .......................................................................... 6
*Smith v. City of New York*, 2005 WL 1026551 (S.D.N.Y. May 3, 2005) .................................... 16
*St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).................... 15
*Universal Calvary Church v. City of New York*, 2000 WL 1538019 at n.37
  (S.D.N.Y. Oct. 17, 2000) ............................................................................................................. 8
*Vann v. City of New York,* 72 F.3d 1040, 1050 (2d Cir.1995)...................................................... 14
*Weber v. Dell*, 804 F.2d 796, 803 (2d Cir. 1986) ....................................................................... 14
*Williams v. City of Mount Vernon*, 428 F.Supp.2d 146, 157 (S.D.N.Y. 2006)..................... passim
*Williams v. New York City Housing Authority*, 2007 WL 4215876
  (S.D.N.Y. Nov. 30, 2007) ........................................................................................................... 18
*Wilson v. 103rd Precinct*, 182 F.3d 902 (2d Cir. 1999)......................................................... 10,17
*Zahra v. Town of Southold*, 48 F.3d 674, 678 (2d Cir.1995)....................................................... 11

## Statutes

42 U.S.C. §1983................................................................................................................... passim
USC §IV................................................................................................................................... 6

i

## PRELIMINARY STATEMENT

The instant matter is before the Court on Defendants' Edward Lucas ("Lucas"), Mark DiGiacomo ("DiGiacomo") and the Town/Village of Harrison's ("Harrison") motion to dismiss Plaintiff Sofia Saenz's ("Saenz") first amended complaint ("FAC") pursuant to FRCP 12(b)(6) for failure to state a cause of action.[1]

In the FAC, Saenz alleges that various policemen employed by the Harrison Police Department allegedly violated her civil rights under 42 U.S.C. §1983. More specifically, Saenz alleges that these policemen's actions in questioning her and attempting to obtain her cooperation in relation to a criminal investigation purportedly violated her rights. Additionally, Saenz asserts that Harrison has municipal liability as these actions were purportedly undertaken as part of a policy to retaliate against non-party Ralph Tancredi ("Tancredi") in relation to a lawsuit that Tancredi filed against Harrison and various Harrison employees. Without further explanation, the complaint then alleges that "under the premises Defendants violated Plaintiff's rights as guaranteed by the Fourth Amendment to the United States Constitution, 42 U.S.C. §1983."

---

[1] The FAC also identifies Vincent Mussolino ("Mussolino") and Richard Light ("Light") as Defendants in this action. As the FAC pleads arguably colorable causes of action against Mussolino and Light, they have filed an answer rather than a motion to dismiss.

Simply stated, the FAC fails to state a cause of action against Lucas and DiGiacomo as it fails to allege any actions that could reasonably be construed as violative of Saenz's civil rights. Additionally, the FAC does not state a claim against Harrison, as it does not allege any specific municipal policy or custom under *Monell v. City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) which allegedly led to the violation of Saenz's civil rights. Indeed, the only factual allegations in the FAC are related to actions of individual Harrison employees, whose actions were purportedly taken as part of a policy to retaliate against Saenz for a lawsuit filed by Tancredi. As Saenz has failed to allege anything other than a conclusory allegation that there was a policy that resulted in a violation of her rights, she has not made out a cause of action against Harrison.

## STATEMENT OF FACTS[2]

As alleged in the FAC, Saenz is a female of Peruvian origin who resides in the "Northern Counties" of the State of New York. (FAC at ¶3). The complaint identifies the following other parties to the lawsuit: Lucas, DiGiacomo, Mussolino and Light who are police officers employed by Harrison (FAC at ¶¶4-6) and Harrison, which is a municipal subdivision of the State of New York. (FAC at ¶7).

---

[2] As the instant motion is made pursuant to FRCP 12b(6) all factual statements are derived wholly from the FAC, which must be presumed by the Court to be true at this juncture. A copy of the FAC is appended to this submission as Exhibit "A". The defendants do not admit the truth of these statements and only make reference to them for the purposes of this motion.

The Complaint alleges four incidents that purportedly involved conduct attributed to Harrison employees. The first incident allegedly took place on August 20, 2007, when Saenz purportedly witnessed an incident between her former boyfriend ("Tancredi") and her paramour at the time, Joshua Clark ("Clark"). During this incident, Clark allegedly threatened Tancredi with a baseball bat. (FAC at ¶8). At some unknown point, Mussolino ("Mussolino") and an unidentified female police officer seized the bat and transported Saenz to Police Headquarters, where she was purportedly detained for three hours in an effort to "coerce her" to bear witness against Tancredi as retaliation for a lawsuit that Tancredi filed against Harrison and some of its employees. (FAC at ¶9). This retaliatory conduct was purportedly known to and condoned by the "Town's Board of Police Commission." (FAC at ¶10). The complaint alleges that the detention at the Police Headquarters was without consent and without probable cause. (FAC at ¶11).

The second alleged incident involving Harrison employees occurred on some unidentified later date, when Mussolino purportedly appeared at Saenz's residence and asked her to sign paperwork requested by Eggenhauser in order to obtain a temporary order of protection. (FAC at ¶12). The complaint further alleges that Saenz refused to sign the paperwork. (Id.).

The third alleged incident purportedly occurred in the office of non-party, Barbara Eggenhauser ("Eggenhauser"), a Westchester County Assistant District

Attorney.[3] (FAC at ¶16). During this meeting, Eggenhauser purportedly acting in concert with Lucas and Light instructed Saenz that she had been abused by Tancredi and further asked Saenz about Tancredi's cocaine addiction. (Complaint at ¶16). The complaint alleges that during the meeting, Light supposedly told Saenz that Tancredi had called Saenz a "coke whore" (FAC at ¶17) and that Lucas advised Saenz that Tancredi was a thief. (FAC at ¶18). Lastly, the paragraph alleges that the three individuals made "not so subtle threats" that if Saenz did not cooperate they would seek to have her deported. (FAC at ¶19).

The final incident identified in the complaint alleges that after Tancredi's court appearance, Light allegedly drove Saenz to police headquarters where she was "interrogated" about Tancredi and not permitted to leave. (FAC at ¶20). Later, Lucas and DiGiacomo purportedly joined Light and "suggested" that Tancredi was involved in an illegal gambling operation. The complaint alleges that in response, Saenz said that she wished to leave to which Lucas told her to "go with the order of protection – you're in with us" before Light then drove Saenz home. (FAC at ¶21).

The instant matter was commenced by filing of a summons and complaint on November 21, 2007. Thereafter, the Court so-Ordered a stipulation between Saenz and Harrison, extending Harrison's time to answer or otherwise move until

---

[3] Eggenhauser was named a party in the original complaint. However, during the pre-motion conference on February 1, 2008, Saenz agreed to voluntarily discontinue the action against her without prejudice and as such she is not named as a party in the FAC.

the date of a pre-motion conference on February 1, 2008. During the pre-motion conference, Saenz agreed to file an amended complaint (the FAC) which was served on the individual defendants on February 20, 2008.

## POINT I

## THE LEGAL STANDARD FOR A MOTION TO DISMISS

As codified at FRCP 12(b)(6), a party may move to dismiss an action if the complaint fails to state a claim upon which can be granted. When faced with a motion pursuant to FRCP 12(b)(6) the issue is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 177 (2d Cir.2004). Under the reformulated test set down by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S.Ct. 1955,1966, 167 L.Ed.2d 929 (2007), a pleading is required to contain enough facts to render the underlying legal theory plausible. *See generally*, *Baron v. Complete Management, Inc*., __ F.3d __, 2008 WL 205327 (2d Cir. 2008)(affirming dismissal of compliant and denial of leave to replead where proposed amended complaint failed to plead "enough facts to state a claim to relief that is plausible on its face" under *Twombly*). In applying *Twombly*, this Court noted that when making a review of a complaint challenged under Rule 12(b)(6), a court must be

guided by the principle that "a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *See, Miotto v. Yonkers Public Schools,* 2008 WL 199472 at * 2, (S.D.N.Y. Jan. 22, 2008).

In the instant matter it is respectfully submitted that the Court should grant Lucas, DiGiacomo and Harrison's motion as the allegations in the complaint simply cannot sustain an action against them.

## POINT II

## THE PLAINTIFF HAS FAILED TO STATE A CAUSE OF ACTION AGAINST LUCAS AND DIGIACOMO

In the FAC's only cause of action, Saenz asserts that her claim for relief is predicated upon alleged violations of her Fourth Amendment rights. (FAC ¶25). As the Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" U.S. Const. §IV, in order for Saenz to state a cause of action Lucas and DiGiacomo the FAC must contain allegations indicating that Lucas and DiGiacomo effectuated a seizure of Saenz. As the FAC fails to state facts that would give rise to such an inference, it must be dismissed as against Lucas and DiGiacomo.

As stated by the Second Circuit in *Shain v. Ellison*, 273 F.3d 56, 67 (2d Cir. 2001) in order to make out a "§1983 claim for false arrest or

imprisonment, plaintiff must demonstrate that defendant intended to confine him, he was conscious of the confinement, he did not consent to the confinement, and the confinement was not otherwise privileged." *See also, Williams v. City of Mount Vernon*, 428 F.Supp.2d 146, 157 (S.D.N.Y. 2006) and *Decker v. Campus*, 981 F.Supp. 851, 857 (S.D.N.Y. 1997) (noting that a claim arising under 42 U.S.C. §1983 was substantially similar to New York claims, requiring a showing "that the officer intentionally confined him without his consent and without justification").

In the instant matter, the FAC fails to state a claim under § 1983 against either DiGiacomo or Lucas. In relation to DiGiacomo, the only conduct alleged against him in the complaint was that after Light allegedly brought Saenz to the precinct and refused to let her leave:

> Lucas and DiGiacomo then joined Light in the room with Plaintiff and further interrogated her, this time suggesting that Tancredi was involved in illegal gambling operations. Again Plaintiff protested that she did not want "any part of this" and that she "wanted[ed] to go home". In response Lucas cautioned her to "go with the order of protection - - you're in with us. Ultimately, Light drove Plaintiff to her residence.

(FAC at ¶21).

In relation to Officer Lucas, the FAC contains two references to his conduct. In addition to the allegations contained in ¶21 wherein Lucas joined DiGiacomo in the room after other officers purportedly prevented Saenz from leaving, there was an additional allegation against Lucas in relation to a meeting in Eggenhauser's office. As described in ¶16, the FAC indicates that Lucas joined Detective Light

7

and Eggenhauser in Eggenhauser's office at which time they all purportedly instructed Saenz that she had been abused, before Lucas allegedly told her that Tancredi was a thief (FAC at ¶18). Finally the story ends with Lucas allegedly joining Light and Eggenhauser in threatening Saenz that if she did not cooperate against Tancredi "they would seek to have her deported." (FAC at ¶19).

Applying the standards of a cause of action for illegal seizure violations under *Shain*, the complaint simply fails to satisfy the basic obligations of a cause of action against DiGiacomo and Lucas. Indeed, there is no indication from the language of the complaint that either DiGiacomo or Lucas arrested or confined Saenz. As pleaded in ¶21 of the FAC, DiGiacomo and Lucas would have entered the room well after any alleged arrest occurred. *See generally*, *Universal Calvary Church v. City of New York*, 2000 WL 1538019 at n.37 (S.D.N.Y. Oct. 17, 2000)("Because Caliz was already arrested prior to that alleged imprisonment, the Court grants summary judgment as to this claim"). *See also*, *Merritt v. City of New York*, 2001 WL 1097866 (S.D.N.Y. Sept. 19, 2001)("By plaintiff's own testimony, Officer Bradbury did not arrive until well after the initial arrest had taken place; according to plaintiff, Bradbury only showed up once plaintiff had already reached the precinct…plaintiff may not assert a false arrest claim against Officer Bradbury") and *Dallas v. Goldberg*, 2000 WL 1092986 (S.D.N.Y. Aug. 4,

2000)(dismissing claim of false arrest against officer when Plaintiff was already handcuffed before officer arrived).

Since there are no allegations that DiGiacomo or Lucas confined Saenz or even that they refused to allow Saenz to leave the police station, the complaint cannot make out a cause of action against them for violation of Saenz's Fourth Amendment rights and as such the complaint must be dismissed as against DiGiacomo and Lucas.

## POINT III

## THE PLAINTIFF HAS FAILED TO IDENTIFY AN OFFICIAL POLICY, PRACTICE OR PROCEDURE THAT ALLEGEDLY GAVE RISE TO THE CONSTITUTIONAL VIOLATION

It is well established that in order to impose § 1983 liability against a municipal defendant such as Harrison, "the plaintiff must allege a link between the constitutional violation and an identifiable municipal policy, practice or custom." *Williams v. City of Mount Vernon*, 428 F.Supp.2d 146, 159 (S.D.N.Y. 2006) *citing*, *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In so doing, a Plaintiff must demonstrate "a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Furthermore, as noted by this Court in *Goldfine v. Kelly*, 80 F.Supp.2d 153, 162, (S.D.N.Y. 2000) "[t]he mere assertion ⋯ that a municipality has such a custom or

policy is insufficient in the absence of allegations of fact tending to support …
such an inference." Absent the demonstration of such a policy, practice or
procedure, no suit can lie, since a municipality "cannot be liable simply because it
employed the [officers] who allegedly committed the acts in question." *Wilson v.
103rd Precinct*, 182 F.3d 902 (2d Cir. 1999) citing *Monell*, 436 U.S. 658, 691.

In the case at bar, Saenz has identified various acts purportedly committed
by parties and non-parties alike that she maintains resulted in a violation of her
rights under the Fourth Amendment. Additionally, Saenz chose to pursue a lawsuit
against Harrison their municipal employer. Since Harrison cannot be liable under
the doctrine of respondeat superior, Saenz would be required to articulate (in non-
conclusory fashion) a municipal policy, practice or procedure that gave rise to her
claims. As will be discussed below, the FAC fails in this regard as: (1) Captain
Marracini is not a state actor whose actions could be deemed as those of a
policymaker; (2) the FAC merely states in conclusory fashion that a policy exists
and (3) even taking the FAC at face value, the policy does not give rise to a cause
of action.

**A. The Elements of a Cause of Action for Monell Violations**

As discussed above, in order to succeed in an action under 42 U.S.C. 1983, a
plaintiff "must plead and prove that the actions at issue were caused by an official

agency policy or practice which resulted in the violation of plaintiff's constitutional rights." *Hodge v. Ruperto,* 739 F.Supp. 873, 877, (S.D.N.Y. 1990). A complaint that fails in this regard is subject to dismissal. *See generally, Qader v. New York*, 396 F.Supp.2d 466, 469 (S.D.N.Y. 2005)("Plaintiff has not alleged a municipal policy or a causal connection and, therefore, her claim against the City must be dismissed"). As noted by this Court in *Prowisor v. Bon-Ton, Inc.,* 426 F.Supp.2d 165 (S.D.N.Y. 2006), to establish the existence of a municipal policy or custom, a plaintiff must allege:

> (1) the existence of a formal policy officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to "deliberate indifference" to the rights of those who come in contact with the municipal employees.

*Id*. at 174.

In addition to stating the test to be applied in determining whether a cause of action under *Monell* has been pleaded, this Court also stressed the reason for such a detailed test, explaining that "[t]he doctrine of *respondeat superior* is insufficient to support a claim against a municipal employer, as are conclusory assertions of a custom or policy in the absence of factual allegations or inferences. *Id*. at 174, citing *Zahra v. Town of Southold,* 48 F.3d 674, 678 (2d Cir.1995).

11

**B. Saenz Has Not Properly Pleaded a Municipal Policy**

In the case at bar, the complaint details four episodes that purportedly indicate that Saenz's constitutional rights were violated by Harrison employees. However in relation to the municipal policy that purportedly gave rise to these actions, the complaint is virtually silent, merely alleging that the four episodes involving Saenz resulted from a purported policy of retaliating against her former boyfriend (Tancredi) for lawsuits he filed against Harrison. It is respectfully submitted that this is simply insufficient to meet the first part of the test outlined in *Prowisor*.

In relation to the pleading of a policy, this Court has noted that a complaint is insufficient when it contains "only conclusory allegations regarding the existence of a 'formal or de facto policy' on the part of the City with respect to the alleged constitutional violations of which they complain." *Williams v. City of Mount Vernon*, 428 F.Supp.2d 146, 159 (S.D.N.Y. 2006). Such a holding finds support in the Supreme Court's recent decision in *Twombly*, in which the Court required a showing of some facts in order to demonstrate the plausibility of the complaint. *See generally*, *Martino v. Westchester County Dept. of Corrections*, 2008 WL 144827 at *3 (S.D.N.Y. Jan. 15, 2008)(citing to *Twombly* for the principle that a "complaint is measured against a flexible 'plausibility standard,'

which obligates the "pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible").

In the instant matter, the supposed municipal policy is unsupported by any specific factual allegations in the complaint, other than the mere statement that the actions of the Town employees were pursuant to a policy of retaliating against Saenz's boyfriend for his lawsuit filed against Harrison. As there are no facts pleaded in support of such a theory and the alleged policy (even if it existed) was not even directed at Saenz, the first element of the four part test is not satisfied and the suit is subject to dismissal.

### C. Captain Marracini Is Not A Policymaker

The second element of the test outlined in *Prowisor* requiring the identification of a municipal policymaker is similarly not met by the FAC. There are no allegations that the officers who interviewed Saenz and purportedly did not allow her to leave or otherwise allegedly threatened her were policymakers. *See generally Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct, 1292, 89 L.Ed.2d 452 (1986). Indeed, the only allegation that a policymaker was actively involved in the purported violation was that the actions of Lucas and DiGiacomo were at the direction of Captain Marracini ("Marracini") who purportedly enjoys "final policymaking authority." (FAC at ¶4) . As will be discussed below, Captain

13

Marracini is not a policymaker and his purported direction of activities cannot serve as a basis for the imposition of municipal liability against Harrison.

In relation to the allegations that Lucas and DiGiacomo's conduct was at the direction of Marracini, the FAC fails in two respects. Initially, as discussed above, the complaint fails to properly allege that either Lucas or DiGiacomo took actions that resulted in violations of Saenz rights. Since the underlying acts purportedly committed by Lucas and DiGiacomo did not result in a violation of Saenz's rights, there can be no claim that Saenz was injured as a result of an unconstitutional municipal policy. *See generally, Vann v. City of New York,* 72 F.3d 1040, 1050 (2d Cir.1995) ("In order to establish the liability of a municipality in an action under §1983 for unconstitutional acts by a municipal employee below the policymaking level, a plaintiff must establish that the violation of his constitutional rights resulted from a municipal custom or policy").

Even assuming *arguendo* that Lucas and DiGiacomo had committed acts that would give rise to liability under 42 USC §1983, there is still no basis to impose municipal liability against Harrison since the complaint fails to identify any facts under *Twombly* that could plausibly label Marracini as a policymaker for purposes of *Monell*. In general, officers below the Commissioner or Sheriff level are not final policymakers. *See generally, Weber v. Dell*, 804 F.2d 796, 803 (2d Cir. 1986)(ruling that the Sheriff as "the highest ranking law enforcement official

14

in the County" was a policymaker). *See also, Allen v. City of New York*, 2007 WL

24796 (S.D.N.Y. Jan. 3, 2007)(ruling that Chief who was not delegated authority

to establish final city policy related to arrests and was not a policymaker).

In *Anthony v. City of New York*, 339 F.3d 129 (2d Cir. 2003) the Second

Circuit examined a case with some similarities to the case at bar as the Plaintiff had

alleged that a Sergeant who had decision making authority over the conduct of

officers at the scene of an arrest was a policymaker. In ruling that the Sergeant was

not a final policymaker, the Second Circuit noted:

> Anthony likens Sergeant Mendez to the county sheriff in *Jeffes,*
> arguing that Sergeant Mendez had decision-making authority over the
> conduct of the officers at the scene. We think, however, that an
> elected county sheriff has significantly more responsibility in creating
> official policy than does a police sergeant in the NYPD. Anthony does
> not provide any analogue to the state-law authority that a county
> sheriff possesses, and instead argues only that Sergeant Mendez is a
> final decision-maker because he had discretion to determine how to
> handle the particular situation at Wright's apartment. But in *Jeffes,* we
> explicitly rejected the view that mere exercise of discretion was
> sufficient to establish municipal liability. *See id.* at 57 ("It does not
> suffice for these purposes that the official has been granted discretion
> in the performance of his duties." (citing *St. Louis v. Praprotnik,* 485
> U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988))). We
> accordingly reject Anthony's argument that Sergeant Mendez's order
> constitutes an official municipal policy.

*Id*. at 139-140.

Following the Second Circuit's pronouncement in *Anthony*, the New York

District Courts have consistently ruled that lower level police supervisors (even

those with discretion over the conduct of arrests) are not policymakers. *See*

*generally, Raphael v. County of Nassau*, 387 F.Supp.2d 127,132 (E.D.N.Y. 2005)(a Sergeant with decision making authority over the conduct of officers at the scene is not final policymaker). *See also, Diodatti v. City of Little Falls*, 2007 WL 189130 (N.D.N.Y. Jan. 22, 2007)(Sergeants are not final policymakers); *Esgro v. Serkiz*, 2007 WL 203957 (N.D.N.Y. Jan. 24, 2007)(Sergeant who directed officer to arrest Plaintiff was not policymaker); *Allan v. City of New York*, 386 F.Supp.2d 542 (S.D.N.Y. 2005)(Captain as ranking officer on scene who directed junior officers to arrest Plaintiff was not policymaker) and *Smith v. City of New York*, 2005 WL 1026551 (S.D.N.Y. May 3, 2005)(Captain not policymaker).

In this matter, the FAC merely states in conclusory fashion that the Chief has purportedly "abdicated" his responsibility and that all policy is set by Captain Marracini (FAC at ¶4). As the FAC does not contain any facts that could plausibly be construed as indicative that Marracini was a policymaker, his purported ordering of Lucas and DiGiacomo to act (assuming their actions even violated Saenz rights) can not serve as a basis for imposing municipal liability on Harrison.

### D. The Complaint Does Not Allege a Widespread Practice That Could Constitute Municipal Custom

The third prong of the test wherein municipal liability could be imposed (a showing of a widespread custom providing imputed knowledge to policymaking officials), requires a pleading of some facts tending to show the existence of such

policy. *See generally*, *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993)("The mere assertion, however, that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference"). *See also, Wilson v. 103rd Precinct*, 182 F.3d 902 (2d Cir. 1999)(affirming dismissal of complaint at 12(b)(6) stage, in part due to failure to state cause of action for *Monell* violations as "simple bald assertions and conclusions of law do not prevent dismissal of the complaint"). In this matter there are no allegations of fact that would demonstrate a widespread custom and support the imposition of liability under *Monell*.

As discussed above, the FAC's sole cause of action does not spell out how any individually named defendant (including Harrison) purportedly violated Saenz's rights under the Fourth Amendment (FAC at ¶24). Any understanding of the theory that would purportedly impose liability on Harrison must therefore be culled from the language of the allegations themselves. The only reference in the FAC to a municipal policy is contained in ¶10 wherein it is alleged that the actions of Mussolino and Jane Doe in attempting to "coerce" Saenz to testify against Tancredi was in retaliation for lawsuits filed by Tancredi against the Town and that this "retaliatory conduct is known to, and has been expressly condoned by, a majority of the members of the Town's Board of Police Commissioners which *de*

17

*jure* has final discretionary policy making authority over the Police Department and its administration." (FAC at ¶10).

The above referenced conduct cannot serve as a basis for liability as the FAC merely states in conclusory fashion that the retaliatory conduct is widespread and known to the Town Board of Police Commission without providing any facts to support the theory. *See generally, Carbajal v. County of Nassau*, 271 F.Supp.2d 415, 422 (E.D.N.Y. 2003)("mere conclusory allegations are insufficient when unsupported by facts showing that policymakers were aware of the constitutional violations and failed to properly respond"). Indeed, in *McCray v. City of New York*, 2007 WL 4352748 (S.D.N.Y. Dec. 11, 2007) the court applied *Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007)(the Second Circuit's formulation of *Twombly*'s heightened pleading requirement) to grant a Rule 12(b)(6) motion to dismiss *Monell* claims, explaining that "while Plaintiffs enumerate multiple offensive policies or customs, they fail to allege facts that sufficiently render a claim based on the inference of such practices plausible." *See also, Williams v. New York City Housing Authority*, 2007 WL 4215876 (S.D.N.Y. Nov. 30, 2007)(dismissing *Monell* claim as Plaintiff had not provided enough factual allegations to make the claim plausible). Since the FAC does not meet the threshold of pleading any facts that could plausibly indicate

that Harrison's Board of Police Commissioners was aware of a retaliation policy and ignored it, the claim against Harrison cannot survive on this basis.[4]

Finally, even assuming that the complaint did properly allege a policy that the municipal policymakers were aware of but did not respond to, it cannot give rise to a claim of municipal liability since this purported policy was not directed at Saenz. Indeed, even giving the complaint's legal theories the most liberal possible reading, it could only be theoretically construed as pleading a theory that Harrison had a *de facto* policy of retaliating against parties for filing lawsuits against Harrison. However, Saenz has not filed any prior suits and does not allege that these actions were taken against her because of any lawsuit that she filed. Had Tancredi been the recipient of the alleged retaliatory behavior and had Tancredi been the Plaintiff in the instant lawsuit, then perhaps, he could make out a legal theory of a policy of retaliation. However, since Saenz is the plaintiff in the suit at bar there can be no allegations that her injuries resulted from a municipal policy of retaliating against those who bring lawsuits against Harrison. [5]

---

[4] It should also be noted that the complaint does not even offer generalizations that such retaliatory conduct has been visited on other Plaintiffs who had maintained lawsuits against Harrison. See generally, *Back v. Hastings On Hudson Union Free School Dist.***,** 365 F.3d 107, 128 (2d Cir. 2004)("There is, that is, no claim of a "relevant practice [that] is so widespread as to have the force of law" with regard to mothers of young children in positions like Back's").

[5] To the extent that the fourth element of the *Williams* test requires a showing of deliberate indifference to a failure to train it is not relevant to the case at bar as the Plaintiff has not alleged that any event arose from a lack of training.

## CONCLUSION

In light of the foregoing, Lucas, DiGiacomo and Harrison's motion to dismiss the complaint pursuant to FRCP 12(b)(6) should be granted in its entirety.

Dated: Purchase, New York
       March 7, 2008

Respectfully submitted,
FRIEDMAN, HARFENIST, LANGER & KRAUT
Attorneys for Defendants
TOWN/VILLAGE OF HARRISON
2975 Westchester Avenue, Suite 415
Purchase, New York  10577
(914) 701-0800

By:_____S_____
      Neil Torczyner

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

SOFIA SAENZ,

                              Plaintiff,          07 Civ. 10534 (WCC)

          -against-

EDWARD LUCAS, *et. al*,

                              Defendants.

-------------------------------------------------------x

### PLAINTIFF'S MEMORANDUM OF LAW
### IN OPPOSITION OF DEFENDANTS LUCAS,
### DiGIACOMO, AND THE TOWN/VILLAGE OF
### HARRISON MOTION TO DISMISS, PURSUANT TO
### FRCP 12(b)(6), THE FIRST AMENDED COMPLAINT

#### Preliminary Statement

This memorandum of law is submitted in opposition to the 12(b)(6) motion of

Defendants Lucas, DiGiacomo and the Town/Village of Harrison to dismiss the first

amended complaint (hereinafter "FAC").


#### The Presently Incontrovertible Facts as Alleged in the FAC

Pursuant to the direction of Captain Anthony Marraccini, Police Officers Edward

Lucas, Mark DiGiacomo, Vincent Mussolino and Detective Richard Light jointly took

retaliatory action against Plaintiff because Police Officer Ralph Tancredi (Plaintiff's

former boyfriend) filed a series of federal civil rights actions against the Police Chief, the

Police Captain, and *inter alia* the Town Village of Harrison (FAC at 4-6, 10).

That retaliatory conduct is known to, and has been expressly condoned by, a majority of the members of the Town's Board of Police Commissioners which *de jure* has final discretionary policy making authority over the Police Department and its administration (FAC, para. 10).[1]

Pursuant to that directive, and following an August 20, 2007, incident during which Plaintiff's then current boyfriend threatened to strike Tancredi in the head with a baseball bat (FAC at 8-9), Mussolino detained Plaintiff in a room at Police Headquarters for three hours with a view towards coercing her to bear witness against Tancredi - - as ordered by Marraccini (FAC at 10). Plaintiff did not consent to that confinement and made it clear to her captors that she had no interest in participating in their retaliatory plan against Tancredi. In that connection there was neither probable cause nor arguable probable cause to detain her, she was conscious of her confinement, did not consent to it, and the confinement was not otherwise privileged or authorized (FAC at 11).

Days thereafter Mussolino presented himself at Plaintiff's home and attempted to coerce her to sign documents as a predicate for issuance against Tancredi and in favor of Plaintiff of a temporary order of protection. Plaintiff refused to do so and as a result Mussolino directed her to call Assistant Westchester County District Attorney Barbara Eggenhauser (FAC at 12).

Eggenhauser, after being told by Plaintiff that she wanted nothing to do with the matter, made a series of threats to encourage her cooperation (FAC at 14). Eggenhauser there after confined Plaintiff to her (Eggenhauser's) office with a view towards coercing her cooperation (FAC at 15).

---

[1] As to Captain Marraccini, who issued the directive to retaliate, as a matter of fact he has final discretionary decision making authority with respect to the conduct of "investigations", such as the illegal one resulting from his order to retaliate (FAC at 4).

On a second occasion Eggenhauser, with the assistance of Light and Lucas, each threatened Plaintiff with deportation if she did not agree to help them prosecute Tancredi (FAC at 17-19).

Thereafter and on the pretext that he was driving Plaintiff home from a court appearance, Light instead transported her to Police Headquarters, placed her in a room where he was later joined by Lucas and DiGiacomo, and where, against her will, she was further interrogated with a view towards coercing her "cooperation" against Tancredi (FAC at 21).

With respect to the repeated confinements of Plaintiff at Headquarters and her confinement in Eggenhauser's office, Plaintiff did not consent, she was conscious of her confinements, there was no probable cause and/or arguable probable cause to imprison her, and the confinements were not otherwise privileged or authorized (FAC at 22).

Against this background Plaintiff claims damages from *inter alia* "repeated unlawful imprisonments" (FAC at 23).


### POINT I

### THE CLAIMS AGAINST LUCAS AND DiGIACOMO MUST BE TRIED TO A JURY

Hop-scotching over the presently indisputable facts, movants contend in the abstract that because Lucas and DiGiacomo entered the room where Light was holding Plaintiff prisoner (Memorandum at 8) they cannot be sued because a false arrest was committed by Light prior to their arrival. We disagree.

3

As a threshold matter, the FAC is framed not as a series of disjointed events - - as suggested by the movants, for obvious strategic reasons - - but rather as a series of related events that Police Captain Marraccini ordered Lucas, DiGiacomo, Light and Mussolino to engage in for purposes for coercing Plaintiff's otherwise unwilling cooperation in their scheme to punish Ralph Tancredi for exercising his rights as guaranteed by the First Amendment (FAC at 4).

Additionally, and notwithstanding movants' pretense to the contrary, the FAC expressly alleges that the misconduct as engaged in by all four officers was "known to, and has been expressly condoned by, a majority of the members of the Town's Board of Police Commissioners which *de jure* has final discretionary policy making authority over the Police Department and its administration (FAC at 10).

In short, each of the Defendants was acting jointly and in concert in accordance with a specifically directed plan of unlawful action, as approved by the Board of Police Commissioners. Each of the individually named Defendants, as co-conspirators, is of course responsible for the acts of all of them as taken in furtherance of the Board approved plan as directed by Marraccini. Beck v. Prupis, 529 U.S. 494, 503 (2000); Cofacredit v. Windson Plumbing Supply Co., Inc., 187 F.3d 229, 240 (2d cir. 1999).


**POINT II**

**THE TOWN/VILLAGE OF HARRISON
IS LIABLE GIVEN THE BOARD OF
POLICE COMMISSIONERS' APPROVAL
OF THE AT-ISSUE, UNLAWFUL CONDUCT**

Pretending that the FAC does not allege the Board of Police Commissioners' approval of the unlawful conduct as set forth in that pleading, movants offer a variety of

4

canned arguments suggesting that the Town/Village has no exposure in this case. We disagree.

For it is axiomatic that a policy for purposes of <u>Monell</u> can be established by the single act of policy makers with final discretionary decision-making authority. <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480-1 (1986); <u>Beck v. Hastings on Hudson Union Free School District</u>, 365 F.3d 107, 128 (2d Cir. 2004); <u>Rookard v. Health & Hospitals Corporation</u>, 710 F.2d 41, 45 (2d Cir. 1983).

Since the Board of Police Commissioners is, as a matter of New York State law, vested with final discretionary decision making power over the Police Department [C. 812, New York L. 1936 as amended (Westchester Police Act governing administration of police departments in towns situated in Westchester County, New York, copy annexed in appendix; Section 5711-q of the New York State Unconsolidated Laws (governing administration of police departments in Villages within Westchester County)], the Town/Village is answerable in damages in this case under <u>Monell</u>.

<u>Conclusion</u>

The motion should in all respects be denied.

Dated: White Plains, N.Y.
      April 30, 2008

LOVETT & GOULD, LLP
By: _____
Jonathan Lovett (4854)
Attorneys for Plaintiff
222 Bloomingdale Road
White Plains, N.Y. 10605
914-428-8401

5

# A P P E N D I X

except by the consent of the board of trustees. Every village policeman shall keep a book in which shall be entered all services performed by him which are a town or county charge, and shall present claims therefor against the town or county to which chargeable. All orders or warrants for such claims, except those hereinabove specified, shall be made payable to the village treasurer, who shall collect the amount thereof.

§ 16. Retirement of policemen in certain villages. In any such village, a member of the police force whose compensation is a fixed salary, who shall have served a continuous term of employment as such of twenty years in one or more police departments in such county, or whose employment in two or more such terms shall in the aggregate amount to a total period of employment of twenty years, may, if unable to perform his regular duties in a manner satisfactory to the board of trustees of such village, be retired. A policeman so retired shall be paid one-half of the salary paid a member of such police department of the rank of retiring member for the year immediately preceding such retirement. Such payment shall in no case exceed one thousand dollars per annum and shall be paid out of moneys provided by such board of trustees to be levied and collected in the same manner as other village funds are levied and collected and shall not be subject to claims of creditors.

§ 17. This act shall take effect immediately.

---

# CHAPTER 104

AN ACT providing for the establishment, organization and operation of police departments in the towns of Westchester county

Became a law March 14, 1936, with the approval of the Governor. Passed, three-fifths being present

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

Supersedes existing law.
    Section 1. Establishment, organization and operation of town police departments in the county of Westchester. Notwithstanding any other provisions of law, the establishment, organization and operation and all matters concerning police or police departments in all towns in the county of Westchester shall be governed solely by the provisions of this act except that nothing herein shall be construed to prohibit the establishment of police pension funds in such towns in accordance with the provisions of chapter seven hundred ninety-one of the laws of nineteen hundred twenty-eight as amended. The employment of such policemen and special policemen shall continue to be in accordance with the rules of the state civil service commission as heretofore extended by it to the employment of policemen in the towns of Westchester county.

§ 2. **Establishment of town police departments.** A. The town board of any town in Westchester county which now has a police force or police department, or employs police officers or policemen or which hereafter employs such policemen or police officers, shall establish a police department and appoint a chief of police, and such lieutenants, sergeants and patrolmen as may be needed and fix their compensation, except that it shall not be mandatory for a town which employs special policemen only for temporary periods of time in accordance with this act to establish a police department. The compensation of such policemen shall be a town charge. The town board may, at its option, determine that the town shall pay all or part of the cost of the uniforms and necessary equipment of its policemen. When appointed, such policemen shall be peace officers and shall have all the powers and be subject to all the duties and liabilities of a constable of such town in all criminal actions and proceedings and special proceedings of a criminal nature.

B. The town board of a town in which such a police department has been established at any time by resolution may establish a board of police commissioners for such town and appoint one or three police commissioners who shall at the time of their appointment and throughout their term of office be owners of record of real property in and electors of such town, and who shall serve without compensation, and at the pleasure of the town board. If the town board shall appoint only one such police commissioner, it shall in addition designate two members of the town board to serve as members of such police commission. When either of such boards of police commissioners shall have been established, such board of police commissioners shall have and exercise all the powers relative to police matters conferred upon the town board pursuant to this article. The town board may by resolution at any time abolish such police commission and thereupon the town board only shall exercise the powers conferred upon it by this article.

§ 3. **Qualifications.** No person shall be eligible to appointment or reappointment to such police department, nor continue as a member thereof, who shall not be a citizen of the United States, who has been convicted of a felony, who shall be unable to read and write understandingly the English language or who shall not have resided within the state of New York one year and in any town or village in Westchester county for six months next preceding his appointment. No person shall be appointed a member of such police force who is over the age of thirty-five years; provided, however, that a person who is serving as a town policeman who is over the age of thirty-five years and who possesses the above qualifications shall be eligible for appointment in such department, at the time of its organization only. No person shall be appointed a member of such police force unless he shall have passed an examination, held by the state civil service department, and unless at the time of his appointment his name shall be on the eligible list of the state civil service department.

**§ 4. Promotion.** Promotions of officers and members of such police department shall be made by the town board on the basis of seniority, meritorious police service and superior capacity as shown by competitive examination, such examination to be conducted by the state civil service department. Individual acts of personal bravery may be treated as an element of meritorious service in such examination. The town board shall keep a complete service record of each member of such police department in accordance with the rules and regulations of the state civil service department and shall transmit the record of each candidate for promotion to the state civil service department in advance of such examination. Notwithstanding any other special or general laws to the contrary, such promotion examination shall be competitive examinations held by the state civil service commission regardless of the number of candidates eligible for such promotion, and if the number of candidates is restricted to less than four by the action of the town board, and if the names of one or more candidates are certified as having passed such examination, such name or names shall constitute an eligible list under the civil service law. In no case shall the requirements for service for the respective offices be for longer periods than the following periods of time: for the office of chief, one year as lieutenant or two years as sergeant or three years as patrolman; for the office of lieutenant, one year as sergeant or two years as patrolman; for the office of sergeant, one year as patrolman. No person shall be eligible to take such promotion examination unless he is serving as a policeman on the police force of a town or village in Westchester county.

**§ 5. Transfers.** Transfers from one town police department to another town or village police department in the county may be made upon the mutual consent of the appointing officers of the departments affected. Any member of such police force who is or has been transferred shall receive credit with the town department to which he is transferred for time served on the police force or in the department of any village or town within the county, as though the full time had been served with the department to which he has been transferred, for purposes of seniority, promotion, pensions and general administration.

**§ 6. Administration.** The town board may make, adopt and enforce rules, orders and regulations for the government, discipline, administration and disposition of the police department and of the members thereof. Such rules and regulations and all amendments thereto shall be in writing and shall be posted in a conspicuous place in the police headquarters. Each member of the department shall receive a copy thereof and of all amendments thereto.

**§ 7. Discipline and charges.** Except as otherwise provided by law, a member of such police department shall continue in office unless suspended or dismissed in the manner hereinafter provided. The town board shall have the power and authority to adopt and make rules and regulations for the examination, hearing, investiga-

tion and determination of charges, made or preferred against any member or members of such police department. Except as otherwise provided by law, no member or members of such police department shall be fined, reprimanded, removed or dismissed until written charges shall have been examined, heard and investigated in such manner or by such procedure, practice, examination and investigation as the board, by rules and regulations from time to time, may prescribe. Such charges shall not be brought more than sixty days after the time when the facts upon which such charges are based are known to the town board. Any member of such police department at the time of the hearing or trial of such charges shall have the right to a public hearing and trial and to be represented by counsel; no person who shall have preferred such charges or any part of the same shall sit as judge upon such hearing or trial. Witnesses upon the trial of such charges shall testify thereto under oath. No member of such department who shall have been dismissed shall be reinstated unless he shall, within twelve months of his dismissal, file with such board a written application for a rehearing of the charges upon which he was dismissed. Such board shall have the power to rehear such charges and, in its discretion, may reinstate a member of the force after he has filed such written application therefor.

Any member of such department found guilty upon charges, after five days' notice and an opportunity to be heard in his defense, of neglect or dereliction in the performance of official duty, or of violation of rules or regulations or disobedience, or of incompetency to perform official duty, or of an act of delinquency seriously affecting his general character or fitness for office, may be punished by the town board having jurisdiction, by reprimand, by forfeiture and withholding of salary or compensation for a specified time not exceeding twenty days, by extra tours or hours of duty during a specified period not exceeding twenty days, by suspension from duty for a specified time not exceeding twenty days and the withholding of salary or compensation during such suspension, or by dismissal from the department. Such board shall have the power to suspend, without pay, pending the trial of charges, any member of such police department. If any member of such police department so suspended shall not be convicted of the charges so preferred, he shall be entitled to full pay from the date of suspension. The conviction of a member of such police department by the town board shall be subject to review by certiorari to the supreme court in the judicial district in which such town is located, provided that application therefor be made within thirty days from the determination of such conviction by the town board.

§ 8. **Effect of resignation.** Any member of such department who shall resign shall not be reinstated by such board unless he shall make written application, within twelve months of his resignation, for reappointment as a member of such department.

§ 9. **Absentee leave.** Every member of such police department shall be entitled, in addition to any vacation or absentee leave now

LAWS OF NEW YORK, 1936 [CHAP.

prescribed by law, to one day of rest in seven. The chief or acting chief of the police department shall keep a time book showing the name and shield number of each member of the department and the hours worked by each of such policemen in each day. The town board may make a variation from the above prescribed hours of vacation, provided the member shall receive during each year the actual number of days absentee leave to which he is entitled. The town board, at its option, may, in addition to the days of rest herein-before provided, grant an annual vacation with pay. Whenever the town board shall designate any policeman to attend police school, such attendance shall be deemed in the course of duty and when so attending he shall receive his usual pay and reimbursement for actual and necessary expenses. Sick leave with full pay may be granted whenever such sickness or disability has been incurred without the delinquency of the policeman.

§ 10. Special policemen. The town board of any such town, whether there be a police department in and for such town or not, may employ temporary police officers from time to time as the town board may determine their services necessary. Such police officers shall be known as "special policemen" and shall have all the power and authority conferred upon constables by the general laws of the state and such additional powers, not inconsistent with law, as shall be conferred upon them by the town board. They shall be subject to the general authority and direction of the town board and to such orders and regulations as the town board may prescribe, not inconsistent with law. Such special policemen shall serve at the pleasure of the town board and the town board shall fix their compensation and may purchase uniforms and equipment therefor but no such special policemen shall be appointed nor any expense incurred by reason thereof unless said town board shall have provided therefor in its annual budget, previously adopted, and no expenditure shall be made in excess of the budget appropriation therefor. Such special police shall not be eligible to appointment unless they shall have passed an examination held by the state civil service commission, and unless their names shall be on the eligible list of the said commission at the time of their appointment, and unless such special policemen possess the qualifications set forth in section three of this act.

§ 11. Hours of duty and vacations. In the police department of all such towns, a day's tour of duty shall consist of not more than eight consecutive hours in each twenty-four except in the case of a public emergency. Every member of such police department shall be allowed an annual vacation of not less than fourteen consecutive days without diminution of salary or compensation as fixed by or pursuant to law, except in case of public emergency. In the event of a public emergency during which the vacation or portion of a vacation of a member shall have been withheld, upon the cessation of such emergency, such member shall then receive with pay the number of days of such vacation withheld.

§ 12. This act shall take effect immediately.

# CHAPTER 105

AN ACT to amend the religious corporations law, in relation to incorporation of parishes or churches of the Holy Orthodox Churches in America

Became a law March 16, 1936, with the approval of the Governor. Passed, three-fifths being present

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

Section 1. Chapter fifty-three of the laws of nineteen hundred nine, entitled "An act in relation to religious corporations, constituting chapter fifty-one of the consolidated laws," is hereby amended by inserting therein a new article, to be article three-b, to read as follows:

New Art. 3-b added (§) 50-aa, 50-bb, 50-cc, 50-dd, 50-ee, 50-ff, 50-gg, 50-hh, 50-ii, 50-jj, 50-kk, 50-ll, 50-mm).

## ARTICLE 3-b

PARISHES OR CHURCHES OF THE HOLY ORTHODOX CHURCH IN AMERICA

Section 50-aa. Application for incorporation.
    50-bb. Notice of meeting for incorporation.
    50-cc. Provisions governing meetings for incorporation.
    50-dd. Resolution to be adopted at incorporation meeting.
    50-ee. Certificate of incorporation.
    50-ff. Annual and special corporate meetings.
    50-gg. Changing date of annual corporate meetings.
    50-hh. Changing number of laymen trustees.
    50-ii. Meetings of trustees.
    50-jj. Vacancies among trustees.
    50-kk. Rector; vicar; ministers; their appointment, removal and compensation.
    50-ll. Additional qualifications of voters at annual and special corporate meetings.
    50-mm. Transfer of property of extinct parishes and churches.

§ 50-aa. Application for incorporation. An unincorporated congregation of the Holy Orthodox Church in America, or a congregation acknowledging the historic apostolic eastern confession and order in this state, may apply to the archbishop who is the ecclesiastical * administrator of Metropolitan Synod, Holy Orthodox Church in America for permission and sanction to incorporate such church. When such permission aforesaid has been obtained in writing over the signature and seal of such archbishop, such church may become an incorporated church by executing, acknowledging and filing a certificate of incorporation as hereinafter provided.

Any religious order, biblical seminary for the preparation of candidates for the ministry, leading to ordination and

---

* So in original. (Word misspelled.)

relative thereto shall be complied with. Upon completion thereof he shall submit them to the county superintendent of highways, who, if he approves them in writing, shall notify the board of supervisors of such approval.

§ 6. The board of supervisors may, after receipt of such approval, allocate and appropriate as provided in section two of this act not to exceed twenty per centum of the funds received in any fiscal year by the county treasurer of the county of Monroe pursuant to the provisions of article twelve-a of the tax law and section seventy-three of the vehicle and traffic law, to be used to pay not to exceed seventy-five per centum of said estimated costs of such work in such public streets.

§ 7. In the event such appropriation is made by the board of supervisors, the council of the city of Rochester may, not later than sixty days from the making of such appropriation and allocation, provide by ordinance for the doing of such work and the charging to the county of Monroe seventy-five per centum of the cost of such work but not in excess of the amount of such appropriation and allocation. Said work shall be done in accordance with the provisions of the charter of the city of Rochester. The county superintendent of highways shall inspect the work while in progress from time to time and also upon completion thereof.

§ 8. Upon completion of such work the commissioner of public works shall file with the city clerk, the clerk of the board of supervisors and the county superintendent of highways, a certificate of completion which shall state: a brief description of the work; that it was done pursuant to this law; that it is completed in accordance with the specifications approved by the county superintendent of highways; the cost thereof, and the part of the cost to be paid by the county of Monroe. The county superintendent of highways shall audit the cost and for that purpose shall have access to all necessary city records. If he finds the work is completed in accordance with the specifications, he shall certify to the county treasurer: (a) a brief description of the work; (b) that it was done pursuant to this law; (c) that the work is completed in accordance with specifications approved by him; (d) the total cost of the work; (e) the part of the cost of the work to be paid by the county of Monroe. The county treasurer shall thereupon pay said amount to the treasurer of the city of Rochester upon duly executed vouchers in the same manner as other county road expenditures are made. The amount that the part of the cost according to such certificate to be paid by the county of Monroe is in excess of the amount allocated and appropriated for such work by the board of supervisors, pursuant to section two of this act, shall be borne by the city of Rochester and any amount by which such allocation and appropriation exceeds the part of the cost according to such certificate to be paid by the county of Monroe shall revert to the funds received as described in section two of this act and shall be subject to reappropriation on distribution.

§ 9. While said work is in progress, the commissioner of public

works may, in consultation with the county superintendent of highways, effect minor changes in plans and specifications when he and the county superintendent of highways find that such changes would promote the public interest.

§ 10. The provisions of all statutes requiring and providing for distribution by the board of supervisors of the county of Monroe of funds received by the Monroe county treasurer pursuant to the provisions of article twelve-a of the tax law and section seventy-three of the vehicle and traffic law are hereby changed, modified and superseded to the extent of the allocations of the portion of such funds by the board of supervisors of Monroe county pursuant to the provisions of this act and all provisions of such other statutes providing for and requiring distribution of funds so received shall apply only to such funds so received less payments made to the city of Rochester pursuant to this act.

§ 11. This act shall take effect immediately.

---

# CHAPTER 812

AN ACT to amend chapter one hundred and four of the laws of nineteen hundred thirty-six, entitled "An act providing for the establishment, organization and operation of police departments in the towns of Westchester county," generally

Became a law April 27, 1941, with the approval of the Governor. Passed, three-fifths being present

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

Section 1. Subdivision B of section two, sections four and seven of chapter one hundred and four of the laws of nineteen hundred thirty-six, entitled "An act providing for the establishment, organization and operation of police departments in the towns of Westchester county," are hereby amended to read as follows:

B. The town board of a town in which such a police department has been established shall be the board of police commissioners, except that at any time by resolution said town board may establish a board of police commissioners for such town and appoint one or three police commissioners who shall at the time of their appointment and throughout their term of office be owners of record of real property in and electors of such town, and who shall serve without compensation, and at the pleasure of the town board. If the town board shall appoint only one such police commissioner, it shall in addition designate two members of the town board to serve as members of such police commission. When either of such boards of police commissioners shall have been established, such board of police commissioners shall have and exercise all the powers relative to police matters conferred upon the town board pursuant to this article. The town board may by resolution at any time abolish such police commission and there-

upon the town board only shall exercise the powers conferred upon it by this article.[1]

§ 4.
Amended.

*4. Promotion. Promotions of officers and members of such police department shall be made, and all vacancies above the grade of patrolman filled whenever possible by promotion from among persons holding positions in a lower grade in the department in which the vacancy exists, by the town board on the basis of seniority, meritorious police service and superior capacity as shown by competitive examination, such examination to be conducted by the state civil service department. Individual acts of personal bravery may be treated as an element of meritorious service in such examination. The town board shall keep a complete service record of each member of such police department in accordance with the rules and regulations of the state civil service department and shall transmit the record of each candidate for promotion to the state civil service department in advance of such examination. Notwithstanding any other special or general laws to the contrary, such promotion examination shall be competitive examinations held by the state civil service commission regardless of the number of candidates eligible for such promotion, and if the number of candidates is restricted to less than four by the action of the town board, and if the names of one or more candidates are certified as having passed such examination, such name or names shall constitute an eligible list under the civil service law. In no case shall the requirements for service for the respective offices be for longer periods than the following periods of time: for the office of chief, one year as lieutenant or two years as sergeant or three years as patrolman; for the office of lieutenant, one year as sergeant or two years as patrolman; for the office of sergeant, one year as patrolman. No person shall be eligible to take such promotion examination unless he is serving as a policeman on the police force of a town or village in Westchester county.

§ 7.
amended.

§ 7. Discipline and charges. Except as otherwise provided by law, a member of such police department shall continue in office unless suspended or dismissed. The town board or board of police commissioners shall have power and is authorized to adopt and make rules and regulations for the examination, hearing, investigation and determination of charges, made or preferred against any member or members of such police department, but no member or members of such police department shall be fined, reprimanded, removed or dismissed until written charges shall have been investigated, examined, heard and determined by such town board or board of police commissioners in such manner, procedure, practice, examination and investigation as such board may, by such rules and regulations from time to time prescribe, except that the trial of such charges shall not be delegated and must be heard before the full town board or full board of police commissioners or a majority of the members of either of such boards, and the affirmative vote of a majority of such members shall be necessary for a conviction on

[1] Amendments throughout chapter too numerous to indicate by footnotes.
* So in original. ["§" evidently omitted.]

any such charges. Such charges shall not be brought more than ninety days after the time when the facts upon which such charges are based are known to such town board or board of police commissioners. Any member of such police department at the time of the hearing or trial of such charges before such town board or board of police commissioners shall have the right to a public hearing and trial and to be represented by counsel at any such hearing or trial and any person who shall have preferred such charges or any part of the same shall not sit as a member of such town board or board of police commissioners upon such hearing or trial and any and all witnesses produced upon the trial shall testify under oath.

Any member of such department found guilty upon charges after five days' written notice and an opportunity to be heard in his defense, of neglect or dereliction in the performance of official duty, or violation of rules or regulations or disobedience, or incompetency to perform official duty, or an act of delinquency seriously affecting his general character or fitness for office, may be punished by such town board or board of police commissioners before which such charges are tried, by reprimand, forfeiture and the withholding of salary or compensation for a specified time not exceeding twenty days, by suspension from duty for a specified time not exceeding twenty days and the withholding of salary or compensation during such suspension, or by dismissal from the department. Such town board or board of police commissioners shall have the power to suspend, without pay, pending the trial of charges, any member of such police department. If any member of such police department so suspended shall not be convicted by such board of the charges so preferred, or if on review his conviction shall be reversed, then, notwithstanding such charges and suspension, he shall be entitled to full pay from the date of suspension to the date of reinstatement less the amount of compensation, if any, received by him from any other employment or occupation during the period beginning with such date of suspension to the date of his reinstatement and he shall be entitled to an order as provided in article seventy-eight of the civil practice act to enforce such payment.

§ 2. Section eight of such chapter is hereby repealed and a new § 8. repealed. section eight is hereby inserted, to read as follows: new § 8. added.

§ 8. Review of convictions. The conviction of any member of such police force shall be subject to review, as provided in article seventy-eight of the civil practice act, in a proceeding in the supreme court in the judicial district in which such town is located, provided a verified petition for such a review, setting forth that said conviction is illegal and specifying the grounds of illegality, be presented to the court within sixty days after the conviction.

§ 3. Section nine of such chapter is hereby renumbered section § 9. eleven and a new section nine is hereby inserted, to read as follows: renumbered § 11.

§ 9. Reinstatement after dismissal. Any member of such police new § 9. force who shall have been so dismissed or who is hereafter dis- added.

missed, may be reinstated as a member of such police force, whether he has made application for a review, as authorized in the preceding section or not, provided he shall within twelve months of his dismissal file with such board a written application for rehearing of the charges upon which he was dismissed. Such board shall have the power to rehear such charges and in its discretion reinstate a member of the force after he has filed such written application therefor.

§ 10. renumbered § 17. new § 10. added.

§ 4. Section ten of such chapter as last amended by chapter one hundred and ninety-two and seven hundred and thirty-six of the laws of nineteen hundred thirty-nine, is hereby renumbered section seventeen and a new section ten is hereby inserted, to read as follows:

§ 10. Reinstatement after resignation. Any member of such force, who shall resign, shall not be reinstated by such board unless he shall make written application, within twelve months of his resignation, to such board for reappointment as a member of such force.

§ 11. renumbered § 14. New § 11. amended.

§ 5. Section eleven of such chapter is hereby renumbered section fourteen and section nine of such chapter, as hereby renumbered section eleven, is hereby amended to read as follows:

§ 11. Absentee leave. Every member of such police department shall be entitled, in addition to any vacation or absentee leave now prescribed by law, to one day of rest in seven. The chief or acting chief of the police department shall keep a time book showing the name and shield number of each member of the department and the hours worked by each of such policemen in each day. In case of public emergency the town board or board of police commissioners may make a variation from the above hours of vacation, provided the member shall receive during each year the actual number of days absentee leave to which he is entitled. Whenever the town board or board of police commissioners shall designate any policeman to attend police school, such attendance shall be deemed in the course of duty and when so attending he shall receive his usual pay and reimbursement for actual and necessary expenses. Sick leave with full pay may be granted whenever such sickness or disability has been incurred without the delinquency of the policeman.

New § 14. amended.

§ 6. Section eleven of such chapter, as renumbered section fourteen by this chapter, is hereby amended to read as follows:

§ 14. Hours of duty and vacations. In all such police departments of all towns, a day's tour of duty shall consist of not more than eight consecutive hours in each twenty-four, in no case to exceed forty-eight hours in any week, except in the case of a public emergency. Every member of such police department shall be allowed an annual vacation of not less than fourteen consecutive days without diminution of salary or compensation as fixed by or pursuant to law, except in case of public emergency. In the event of a public emergency during which the vacation or portion of a vacation of a member shall have been withheld, upon the cessation

of such emergency, such member shall then receive with pay the number of days of such vacation withheld.

§ 7. Such chapter is hereby amended by inserting therein two new sections, to be sections fifteen and sixteen, to read respectively as follows:

**New §§ 15, 16, added.**

§ 15. **Uniformity.** All patrolmen who shall have served four years or upwards on such police force shall be patrolmen of the first grade. The annual salary and compensation of the men of such town police force shall be uniform in accordance with their rank and grade except as provided by section twelve of this chapter.

§ 16. **Composition of police force; duties and powers.** Until otherwise provided by law, the police force in the police department of such town shall consist of a chief of police, and such lieutenants of police, sergeants of police and patrolmen as may be needed. The chief of police of such town shall be the commanding officer of the police force. He shall be chargeable with and responsible for the execution of all laws and rules and regulations of the department. Subject to the approval of the town board or board of police commissioners, he shall assign to duty the officers and members of the police force, and shall have power to change such assignments from time to time whenever, in his judgment, the exigencies of the service may require such change, provided, however, that officers and members of the police force only hereafter shall be assigned to police duty. He shall, with the consent of the town board or board of police commissioners have power to relieve from active duty on patrol any member of the police force who, while in the actual performance of duty and without fault or misconduct on his part, shall have become disabled physically as a result of injuries or illness incurred in the line of duty, so as to be unfit to perform full police duty, and such disability having been certified to by so many of the police surgeons as the board may require, and assign such member to the performance of such light duties as he may be qualified to perform. Subject to the approval of the town board or board of police commissioners, he shall have the power to suspend without pay, pending investigation of charges by the board, any member of the police force. If any member of the police force so suspended shall not be convicted by the town board or board of police commissioners of the charges so preferred, he shall be entitled to full pay from the date of suspension, notwithstanding such charges and suspensions.

§ 8. Section seventeen of such chapter, as thus renumbered by this chapter and last amended by chapters one hundred and ninety-two and seven hundred and thirty-six of the laws of nineteen hundred thirty-nine, is hereby amended to read as follows:

**§ 17, amended.**

§ 17. **Special policemen.** The town board of any such town, whether there be a police department in and for such town or not, may employ temporary police officers from time to time as the town board may determine their services necessary. Such police officers shall be known as "special policemen" and shall have all the power and authority conferred upon constables by

the general laws of the state and such additional powers, not inconsistent with law, as shall be conferred upon them by the town board. They shall be subject to the general authority and direction of the town board and to such orders and regulations as the town board may prescribe, not inconsistent with law. Such special policemen shall serve at the pleasure of the town board and the town board shall fix their compensation and may purchase uniforms and equipment therefor but no such special policemen shall be appointed nor any expense incurred by reason thereof unless such town board shall have provided therefor in its annual budget, previously adopted, and no expenditure shall be made in excess of the budget appropriation therefor. Such special police shall not be eligible to appointment unless they shall have passed an examination held by the state civil service commission, and unless their names shall be on the eligible list of the said commission at the time of their appointment, and unless such special policemen possess the qualifications set forth in section three of this act; provided, however, that persons who have been appointed from a civil service list as policemen or special policemen and who have served as such for a period of not less than two years shall be eligible for appointment as policemen in the town in which the service has been rendered where such town shall establish a police department pursuant to the provisions of this chapter at any time prior to the first day of February, nineteen hundred forty. The compensation of such special policemen and the expense of the uniforms and equipment therefor if purchased by the town, shall be a charge against the taxable property of that part of the town outside any incorporated village or villages having and maintaining a village police department or village police force, to be assessed, levied and collected in the town in the same manner as other town charges.

§ 9. This act shall take effect immediately.

---

# CHAPTER 813

AN ACT legalizing and validating the acts and proceedings of the supervisor, town board and officials of the town of Mount Pleasant, county of Westchester, relative to the sales held in the years nineteen hundred thirty-six, nineteen hundred thirty-seven, nineteen hundred thirty-eight and nineteen hundred forty of tax liens for taxes in said town; providing a statute of limitations upon the commencement of actions to attack or the defense of actions to sustain the validity of such sales, and making all proceedings had in connection with such sales conclusively valid at the expiration of the period of limitation

Became a law April 27, 1941, with the approval of the Governor. Passed, three-fifths being present

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

Mount Pleasant, town tax sales.

Section 1. All acts and proceedings of the supervisor, town board and officials of the town of Mount Pleasant, county of West-

chester, and of any officers of said town heretofore had and taken
or caused to be had and taken in relation to the sales held in such
town in the years nineteen hundred thirty-six, nineteen hundred
thirty-seven, nineteen hundred thirty-eight, nineteen hundred
thirty-nine and nineteen hundred forty of tax liens, entitled to be
sold under the provisions of chapter one hundred and five of the
laws of nineteen hundred sixteen, as amended, for armory and
court expenses, county, town and highway taxes, town and county
district taxes and assessments, water rents and school and other
taxes and assessments, including the publication and posting of
notices of such sales, are hereby legalized and validated and con-
firmed notwithstanding and so as to cure, remedy and correct all
defects and irregularities therein.

§ 2. Any action or proceeding to contest the validity or regu-
larity of a transfer of tax lien heretofore issued based on such
sales of tax liens in the town of Mount Pleasant held in the years
nineteen hundred thirty-six, nineteen hundred thirty-seven, nine-
teen hundred thirty-eight, nineteen hundred thirty-nine and nine-
teen hundred forty, including all proceedings prior to the sale, the
levy and assessment of the taxes, the posting and publication of all
notices and the sales themselves and the proceedings following the
sales upon which said transfers are based must be commenced
within six months from the date this act takes effect or be forever
barred.

§ 3. In an action or proceeding to enforce any right, title or
interest in real property based upon a transfer of tax lien hereto-
fore made and issued by the supervisor of the town of Mount
Pleasant under and by virtue of such sales of tax liens in such
town held in the years nineteen hundred thirty-six, nineteen hun-
dred thirty-seven, nineteen hundred thirty-eight, nineteen hundred
thirty-nine and nineteen hundred forty, the invalidity or irregu-
larity of such transfer of tax lien, due to any proceeding prior to
the sales, the levy and assessment of the taxes, the posting and
publication of all notices and the sales themselves or the proceed-
ings following the sales upon which said transfers are based shall
not be interposed or be available as a defense after six months from
the date this act takes effect.

§ 4. All transfers of tax liens heretofore issued by the super-
visor of the town of Mount Pleasant under and by virtue of the
sales held in the years nineteen hundred thirty-six, nineteen hun-
dred thirty-seven, nineteen hundred thirty-eight, nineteen hundred
thirty-nine and nineteen hundred forty of tax liens for taxes in
said town shall, six months after the date this act takes effect, be
deemed conclusive evidence that all proceedings prior to the sales,
including the levy and assessment of the taxes upon which the
sales are based, the posting and publication of all notices and the
sales and all proceedings following the sales were and are valid.

§ 5. If any clause, sentence, paragraph, section or part of this
act shall be adjudged invalid by any court of competent jurisdic-
tion, such judgment shall not affect, impair or invalidate the